UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BROOKE ELIZABETH HEIKE,

          Plaintiff,

                                    Case Number 09-10427-BC

v.                                 Honorable Thomas L. Ludington

SUE GUEVARA, DAVE HEEKE,
PATRICIA PICKLER, CENTRAL
MICHIGAN UNIVERSITY BOARD OF
TRUSTEES,

          Defendants.

_____ /

**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS, DIRECTING
SUPPLEMENTAL BRIEFING, CANCELING HEARING, DISMISSING PLAINTIFF'S
CLAIMS AGAINST DEFENDANT CENTRAL MICHIGAN UNIVERSITY BOARD OF
TRUSTEES, AND DISMISSING PLAINTIFF'S CLAIMS AGAINST DEFENDANTS SUE
GUEVARA, DAVE HEEKE, AND PATRICIA PICKLER IN THEIR OFFICIAL
CAPACITIES EXCEPT TO THE EXTENT THAT PLAINTIFF'S FEDERAL CLAIMS
SEEK PROSPECTIVE INJUNCTIVE RELIEF**

       Plaintiff Brooke Elizabeth Heike filed a nine-count complaint [Dkt. # 1], alleging numerous

federal claims pursuant to 42 U.S.C. § 1983, and state-law claims against Defendants Central

Michigan University Board of Trustees ("CMU"), Sue Guevara, Dave Heeke, and Patricia Pickler,

on November 12, 2008.  Plaintiff's claims generally arise from her removal from CMU's women's

basketball program and the loss of her athletic scholarship.  Defendant Sue Guevara ("Coach

Guevara") is employed by CMU as Head Coach of the women's basketball program.  Defendant

Dave Heeke ("AD Heeke") is employed by CMU as its Athletics Director.  Defendant Patricia

Pickler ("Pickler") is employed by CMU as an Assistant Director in the Office of Scholarships and

Financial Aid.

Plaintiff's claims are addressed in the following counts: (1) violations of procedural and substantive due process pursuant to the Fourteenth Amendment to the U.S. Constitution; (2) violations of the Equal Protection Clause to the U.S. Constitution; (3) breach of contract or implied contract; (4) defamation; (5) tortious interference with a contract or advantageous business relationship or expectancy against the individual Defendants; (6) intentional infliction of emotional distress; (7) violations of certain provisions of the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101, et seq.; (8) negligent hiring of Coach Guevara against CMU and AD Heeke; and (9) negligent supervision of Coach Guevara against CMU and AD Heeke. On February 26, 2009, Defendants filed an answer [Dkt. # 7].

Now before the Court is Defendants' motion to dismiss [Dkt. # 24], filed July 15, 2009. On August 11, 2009, Plaintiff filed a response [Dkt. # 27]; and on August 20, 2009, Defendant filed a reply [Dkt. # 28]. The Court has reviewed the parties' submissions and finds that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, Defendants' motion to dismiss will be granted in part, and supplemental briefing will be directed as to the remainder of the issues raised in Defendants' motion.

I

The following facts are taken from Plaintiff's complaint:

Plaintiff Brooke Heike ("Plaintiff")  is a female individual of Caucasian and Native American descent. Plaintiff attended Romeo High School in Romeo, Michigan, from September 2002 through June 2006. While attending Romeo High School, Plaintiff played on the girls' basketball team. The team had a record of one win and seventeen losses Plaintiff's freshman year,

-2-

yet the team won the league championship Plaintiff's senior year.  Plaintiff won a "Most Valuable Player" ("MVP") award and was co-captain of the team her senior year.  Plaintiff was also named MVP of the MAC Blue All-League Team, member of the first tier MAC All-Conference team, member of the first tier All Metro East team, member of the second tier All Metro East team, and received honorable mention on the All-State team.  Several colleges and universities recruited Plaintiff to join their women's basketball programs and offered her athletic scholarships, including CMU and several other NCAA Division I schools.

Plaintiff generally alleges that CMU and its representatives promised Plaintiff that if she enrolled at CMU and joined its women's basketball team, she would receive a college education at CMU and an athletic scholarship would pay for tuition, room and board, and other expenses during the four years that it would take Plaintiff to earn her degree at CMU.  Specifically, Plaintiff alleges that then-CMU Head Coach Eileen Kleinfelter stated to Plaintiff during recruitment, "I can't guarantee how much playing time you'll receive, but I can guarantee you an education."  Plaintiff alleges that she accepted CMU's offer and declined other offers based on these representations.

On November 3, 2005, then-Athletics Director Herb Deromedi sent Plaintiff a letter, offering her an "athletic grant for the 2006-07 academic year," covering in-state tuition/fees, room and board, and a book loan.  Compl. Ex. 1.  The letter states that renewal of the athletic grant for subsequent years was "subject to the conditions listed on the MAC [Mid America Conference] and National Letters of Intent," which Plaintiff was required to sign.  Plaintiff signed the related letters of intent. Compl. Ex. 2, 3.

Plaintiff matriculated at Central Michigan University in September 2006 and was a member of the women's basketball team for the 2006-07 and 2007-08 seasons.  Previously, in the 2005-06

season under Coach Kleinfelter, the CMU women's basketball team had won sixteen games and lost twelve games.  In April 2007, at the close of the 2006-07 season, CMU announced that Coach Guevara would replace Coach Kleinfelter.  Previously, Coach Guevara had been the head coach of the women's basketball team at the University of Michigan and  an assistant coach at Auburn University.  Subsequently, during the 2007-08 season, the team won six games and lost twenty-three games.

In April 2007, before Coach Guevara had witnessed Plaintiff practice, Plaintiff alleges that she met with Coach Guevara, who told Plaintiff that she did not want Plaintiff to wear make-up. Plaintiff alleges that Coach Guevara subjected her to unwelcome harassment and discipline throughout the 2007-08 season, including by repeatedly telling Plaintiff that she was not her "type" of person.  Plaintiff alleges that Coach Guevara's comments led her to believe that Coach Guevara did not consider Plaintiff to be her "type" of person because Plaintiff identified herself as heterosexual and wore make-up, which Plaintiff perceived that Coach Guevara deemed to be " an unacceptable heterosexual behavior."  Plaintiff alleges that Coach Guevara repeatedly attempted to force Plaintiff to transfer to another college or university, including by directing Assistant Coach Bill Ferrara to tell Plaintiff that Plaintiff should transfer to Saginaw Valley State University.

Plaintiff alleges that Coach Guevara stated to her, in front of other players and assistant coaches, "Your only role on this team is to keep the grade point average up and challenge the players that will play in games."  Plaintiff alleges that at a practice on December 14, 2007, Coach Guevara stated to Plaintiff, in front of the entire team, "Just because you never play doesn't mean you don't have to work hard."  After Plaintiff responded, "I work hard all the time and never get to play?  Why wouldn't I work hard now?" Coach Guevara kicked Plaintiff out of practice.  Plaintiff was so upset

that she could not eat and vomited profusely.  Plaintiff was examined by a medical doctor, who instructed by note that Plaintiff not attend practice on December 15, 2007, because of her illness. Despite receiving the doctor's note as to Plaintiff's illness, Coach Guevara told the assistant coaches and team members that she had kicked Plaintiff out of practice for another day.  Immediately following this incident, Plaintiff requested additional assistance with her work-outs and training. Plaintiff alleges that she never received additional assistance, but such assistance was provided to the other players whom Coach Guevara retained on the team.

On December 19, 2007, Plaintiff was advised by her doctor that her medical conditions were triggered by significant emotional stress.  Despite this, Plaintiff continued to work hard.  Prior to a tournament at Northwestern University, Assistant Coach Ferrara advised Plaintiff that she was going to be considered as a possible starter player or the first player off the bench; Plaintiff was selected as the first player off the bench.  After the tournament, on the bus ride back to CMU, Plaintiff told Coach Guevara that she wanted to watch the film of the game because it was the longest time that she had been able to play in a game.  Coach Guevara directed Plaintiff to Assistant Coach Kathy McGee, with whom Plaintiff made an appointment to view the film of the game.  However, Assistant Coach McGee did not show up at the appointed time, and Plaintiff never viewed the film.

On March 13, 2008, Plaintiff alleges that Coach Guevara told Plaintiff that she was not her "type," that she was eliminating Plaintiff from the team, and that Plaintiff would be losing her athletic scholarship.  Plaintiff alleges that Coach Guevara did not provide Plaintiff with any additional reasons for eliminating her from the team.  Later, Coach Guevara told the team that Plaintiff had been removed from the team because Plaintiff was "unhappy," and not because of any deficiency on the part of Plaintiff or anything having to do with Plaintiff's ability or capacity to

-5-

improve her skills.

On March 27, 2008, Pickler advised Plaintiff by written correspondence that Plaintiff's athletic scholarship and financial aid would not be renewed for the 2008-09 academic year, based on the recommendation of the Athletics Department.  Compl. Ex. 5.  On April 7, 2008, Plaintiff submitted a written request for a hearing and set forth the reasons why she believed Defendants had unfairly deprived her of her scholarship and education.  Compl. Ex. 6.  In essence, Plaintiff's letter contends that Coach Guevara wanted Plaintiff to quit the team because Plaintiff was not her "type," that Coach Guevara "should have to go through the normal process and time period to build the 'type' of team she wants," and that Plaintiff's abilities and efforts were not deficient as compared to the other players on the team.

On June 5, 2008, Pickler advised Plaintiff and Coach Guevara in writing that an appeal hearing was scheduled for June 11, 2008.  Compl. Ex. 7.  Pickler's letter advised that:

> The purpose of this appeal hearing is to determine if the action to not renew Ms. Heike's athletics aid for the 2008-2009 academic year was a substantial injustice.  If the committee decides that it was more likely than not that Coach Guevara's decision was reasonable, it will uphold the decision.  If it decides that it was more likely than not that her decision was unreasonable, it will ask that Ms. Heike's athletics aid be reinstated.

An attachment to the letter described certain procedures that would be followed at the hearing. Compl. Ex. 7.  In particular, the procedures provided that Plaintiff would be able to make a closing statement and to ask questions of Coach Guevara and witnesses.

Another attachment to the letter was entitled "Brooke Heike Statement, prepared by Sue Guevara, April 24, 2008."  Compl. Ex. 8.  In this statement, Coach Guevara wrote:

> Over the course of the season, it was communicated to Brooke that she was not meeting expectations when she: [m]issed box outs . . .[,] [d]id not grab rebounds[,] [l]acked physical play[,] [c]ould not defend post players[,] [m]issed lay-ups in drills[,] [c]onsistently could not compete at the same level of other players in our program.  Her

-6-

skills were significantly deficient in each and every measurable category. Missed sprint times causing the entire team to have additional sprints, which was indicative of lack of effective conditioning.

Coach Guevara further wrote that Plaintiff "consistently struggles to understand key basketball concepts. This was reinforced by the secondary role that she played in all basketball practice activities." Coach Guevara further wrote, "What is most disconcerting is that Brooke never appeared to strike for success," that "[e]ven though Brooke was failing to meet these expectations, she did not seek additional help or assistance," and "[s]he appeared to be very satisfied with her deficiencies."

In comparison, Coach Guevara wrote, "A number of those members of the team who were underachieving throughout the year demanded additional time from coaches to help them with the process of improvement. These individuals continue to be members of the team." Coach Guevara further wrote that Plaintiff was "kicked out of practice" on both December 14 and 15, 2007, "for lack of effort, poor body language, and bad attitude overall . . . this stemmed from her consistently missing sprint times and not grasping basic concepts essential to the completion of conditioning drills."

Plaintiff alleges that she was never provided with any writing regarding her alleged deficiencies, that she was never advised by Coach Guevara as to how she did not meet the expectations of players on the team, and that Coach Guevara never implemented a program to assist her with her alleged deficiencies. Plaintiff further alleges that Coach Guevara never communicated to Plaintiff that retention of her athletic grant was in jeopardy.

On June 11, 2008, Plaintiff appeared before the appeals committee at the CMU Office of Scholarship and Financial Aid for a hearing, which took approximately two hours. *See* Compl. Ex.

9 (Hr'g Tr.).  The appeals committee members were Pickler; Kevin Love, a CMU professor of

management; and Julia Sherlock, CMU Director of Career Services.  Prior to the hearing, Plaintiff

alleges that she asked some of her team members to appear as witnesses on her behalf, but Plaintiff

was told by them that Coach Guevara had instructed them that they were not allowed to testify on

Plaintiff's behalf.  Plaintiff alleges that Pickler did not permit Plaintiff to make an opening statement

or to question witnesses, that Pickler argued on behalf of Coach Guevara, that Pickler rejected

Plaintiff's evidence as not relevant, that Pickler tried to intimidate Plaintiff through verbal abuse

directed at Plaintiff's father, and that Pickler repeatedly interrupted Plaintiff when she asked

questions.[1]

      In the complaint, Plaintiff highlights the following aspects of the hearing, which Plaintiff

asserts conflict with Coach Guevara's written statement dated April 24, 2008:  Plaintiff highlighted

that Coach Guevara confirmed that she had not provided Plaintiff with anything in writing regarding

her alleged deficiencies, that she had not implemented a program to assist Plaintiff with her alleged

deficiencies, that Plaintiff had came to her office to ask for assistance, and that other players had

missed sprints or had been asked to leave practice, yet retained their scholarships.  Coach Guevara

affirmed that she had never before taken away a player's athletic scholarship, but that players on

teams she had previously coached had transferred to other schools after she advised them they would

not receive playing time.  Coach Guevara could not provide examples of Plaintiff's deficiencies.

      Plaintiff alleges that she provided statistics from the 2007-08 season to the appeals

committee, which Plaintiff contends demonstrates that other retained players did not produce results,

---

[1] Notably, Plaintiff's representations regarding what took place at the hearing and the testimony of witnesses may not be entirely accurate and is at least incomplete as compared to the hearing transcript. However, any discrepancies are not material to Defendants' motion to dismiss and will not be addressed at this time.

but received greater playing time than Plaintiff.  Assistant Coach Bill Ferrara testified that the entire team needed to improve, that Plaintiff was frustrated with being singled out for disparate treatment, and that Plaintiff's skills improved over the season.  Plaintiff alleges that she "made clear to the Appeals Committee that she believed she was being singled out for disparate, discriminatory treatment and abusive wrongful sexual harassment because of her race and color and because of her heterosexuality, and that she has suffered because of defendants' wrongful treatment of her."

Finally, Plaintiff alleges that neither AD Heeke, who began his employment as CMU's Athletic Director on January 16, 2006, nor CMU investigated the reasons for Coach Guevara's firing by the University of Michigan in 2003 or whether Coach Guevara had forced players who were not her "type" to leave the team at that school and had poor interpersonal relationships with her players. Six players left the University of Michigan's women's basketball team during the seven seasons that Coach Guevara coached the team.  Plaintiff alleges that those players have stated that poor communication on the part of Coach Guevara or Coach Guevara's invasions into their personal lives were the reasons for their leaving.

## II

Defendants move to dismiss many of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Rule 12(b)(1) motions can be raised at any time, even after trial and the entry of judgment.  Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).  When a defendant challenges subject matter jurisdiction through a motion to dismiss, the plaintiff bears the burden of establishing jurisdiction. *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002).

However, unlike subject matter jurisdiction, when a defendant raises the defense of Eleventh Amendment immunity, it has the burden to show that it is entitled to immunity." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002). Additionally, in contrast to subject matter jurisdiction, "a State may waive Eleventh Amendment immunity through its own conduct: by legislation; by removing an action to federal court; or by appearing without objection and defending on the merits." *Nair v. Oakland County Cmty Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006) (internal quotations and citations omitted).

Similar to Rule 12(b)(1) motions, Rule 12(b)(6) motions can be raised in any pleading, by motion, or at trial. Fed. R. Civ. P. 12(h)(2). In considering a motion to dismiss brought under Rule 12(b)(6), "[t]he court must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). Yet, to survive a Rule 12(b)(6) motion, a plaintiff's complaint "must contain either direct or inferential allegations respecting all the material elements [of the claim] to sustain a recovery under some viable legal theory." *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 444 (6th Cir. 2007) (internal quotation omitted). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). *See also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Twombly v. Bell*, 550 U.S. 544, 555 (2007) (explaining that a complaint must contain something more than a statement of facts that merely creates speculation or suspicion of a legally cognizable cause of action). "When a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to

-10-

the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### III

Defendants advance six main arguments in their motion to dismiss. First, Defendants contend that Plaintiff's claims against CMU should be dismissed because CMU is an arm of the state and claims against it are barred by the Eleventh Amendment. Second, Defendants contend that Plaintiff's claims against Coach Guevara, AD Heeke, and Pickler in their official capacities should be dismissed because the claims are barred by the Eleventh Amendment to the extent that they are based on state law or are based on federal law and seek retrospective relief. Third, Defendants contend that Plaintiff's § 1983 claims seeking monetary liability against CMU and Coach Guevara, AD Heeke, and Pickler in their official capacities should be dismissed because CMU and its officials are not "persons" within the meaning of § 1983. Fourth, Defendants contend that Plaintiff's breach of contract claim against CMU should be dismissed based on the statute of frauds, as an alternative to dismissal based on Eleventh Amendment immunity. Fifth, Defendants contend that Plaintiff's common law tort claims against CMU and the negligence claims against AD Heeke should be dismissed because Defendants are entitled to governmental immunity. Sixth, and finally, Defendants contend that Plaintiff's defamation claim should be dismissed against all Defendants because Plaintiff has failed to plead the claim with sufficient specificity. Each argument will be addressed in turn.

### A

Defendants contend that Plaintiff's claims against CMU should be dismissed because CMU is an arm of the state and claims against it are barred by the Eleventh Amendment. The Eleventh

Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Generally, under the Eleventh Amendment, a state is immune from being sued in federal court, unless it waives that immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97-99 (1984). Additionally, even when the State is not a named party, the suit is barred "when the action is in essence one for recovery of money from the state." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

In her response, Plaintiff does not dispute that CMU is an "arm of the state," rather, Plaintiff contends that Congress has abrogated CMU's immunity as to the claims raised by Plaintiff and that CMU has waived its immunity through participation in this action. First, Plaintiff contends that Congress abrogated CMU's immunity through enactment of 42 U.S.C. § 2000d-7(a)(1), which provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794], title IX of the Education Amendments of 1972 [20 U.S.C.A. § 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C.A. § 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

It is undisputed that CMU receives federal financial assistance. Plaintiff asserts that, pursuant to § 2000d-7(a)(1), CMU is not immune "on [P]laintiff's federal claims under the Fourteenth Amendment," citing *Gratz v. Bollinger*, 122 F. Supp. 2d 811, 834-36 (E.D. Mich. 2000), reversed on other grounds, 539 U.S. 244 (2003).

However, in *Gratz*, the court determined that the State was not immune as to the plaintiff's

-12-

Title VI claims.  *See id.*  Here, Plaintiff does not allege any claims under Title VI, the Rehabilitation Act, Title IX, the ADA, or "any other Federal statute prohibiting discrimination."  Rather, Plaintiff alleges "discriminatory treatment" in violation of the Fourteenth Amendment.  While "Congress may authorize private suits against nonconsenting States pursuant to its § 5 [of the Fourteenth Amendment] enforcement power," it must do so through legislation.  *See Alden v. Maine*, 527 U.S. 706, 756 (1999).  It is not the Fourteenth Amendment itself which abrogates a state's immunity, but the legislation enacted pursuant to it.  Thus, Plaintiff's argument that Congress has abrogated CMU's sovereign immunity as to Plaintiff's federal constitutional claims through § 2000d-7(a)(1) is unpersuasive.

Likewise, Plaintiff's argument that CMU has waived its sovereign immunity through participation in this litigation is unpersuasive.  Plaintiff asserts that CMU did not file a motion to dismiss soon after the complaint was filed in February 2009, filed an answer, and has participated in discovery, including depositions and document requests.  However, CMU did assert sovereign immunity as an affirmative defense at the time that it filed its answer to the complaint.  *See* [Dkt. # 7].  Additionally, there are other individuals named as Defendants in this case, who were entitled to proceed with discovery, pending resolution of the question of sovereign immunity.  *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 547 (2002) (affirming the requirement that consent be "unequivocally expressed").  Based on the above, all of Plaintiff's claims against CMU will be dismissed on the basis of sovereign immunity.

B

Defendants contend that Plaintiff's official capacity claims against Coach Guevara, AD Heeke, and Pickler should be dismissed because the claims are barred by the Eleventh Amendment

-13-

to the extent that they are based on state law or are based on federal law and seek retrospective relief. Defendants concede that sovereign immunity does not bar Plaintiff's federal claims to the extent that they seek prospective injunctive relief.[2] Like her arguments with respect to CMU, Plaintiff contends that Congress has abrogated any immunity of the individuals acting in their official capacities through enactment of § 2000d-7(a)(1), and that the individual Defendants have waived their immunity by participating in the litigation.

Official-capacity suits "genera1ly represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal citation omitted). Lawsuits for monetary damages or retrospective relief against state officials acting in their official capacity are suits against the state, and as such, are barred in federal court by the Eleventh Amendment. *Edelman*, 415 U.S. at 663 (holding that a suit against a state official is barred when the action in essence seeks to recover money from the state, because "the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity"). Based on the above, and for the reasons stated in the preceding section regarding CMU, Congress has not abrogated the sovereign immunity of the individual Defendants in their official capacities, nor have Defendants waived the immunity through participation in this action when they have also been sued in their individual capacities and are entitled to discovery.

Plaintiff also contends that her state law claims are not barred by sovereign immunity because the relief that Plaintiff seeks does not require the Court to "instruct state officials on how to conform their conduct to state law" prospectively, quoting *Pennhurst*, 465 U.S. at 106. Based on

---

[2] Under the doctrine announced in *Ex parte Young*, 209 U.S. 123, 158-59 (1908), a state official sued in his official capacity for prospective equitable relief "is generally not regarded as 'the state' for purposes of the Eleventh Amendment and the case may proceed in federal court." *MacDonald v. Vill. of Northport Mich.*, 164 F.3d 964, 970 (6th Cir. 1999) (internal citations omitted).

the quoted language from *Pennhurst*, Plaintiff contends that state law claims that do not seek prospective injunctive relief are not barred by sovereign immunity.  However, Plaintiff's parsing of *Pennhurst* misconstrues the significance of the quoted statement.

In *Pennhurst*, the Court explained that allowing suits against states for prospective injunctive relief was justified as to federal claims "to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.' " *Id.* at 105 (quoting *Young*, 209 U.S. at 160).  *See also id.* (explaining that such an approach reconciles the competing interests of "the supremacy of federal law" and "the constitutional immunity of the States").  The Court then explained that:

> This need to reconcile competing interests is wholly absent, however, when a plaintiff alleges that a state official has violated *state* law.  In such a case the entire basis for the doctrine of *Young* and *Edelman* disappears.  A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Id.* at 106.  In other words, sovereign immunity bars suits in federal court against state officials acting in their official capacity for violations of state law, regardless of the relief sought.  Thus, Plaintiff's argument that her state law claims against the individual Defendants in their official capacities are not barred by sovereign immunity under *Pennhurst* is not persuasive.

Finally, Plaintiff contends that the Court can exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).  However, the Supreme Court has held that "§ 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state defendants."  *Raygor*, 534 U.S. at 542.  This means that supplemental jurisdiction can only be exercised if the state has waived its sovereign immunity.  In this case, the state Defendants have not

-15-

waived sovereign immunity, thus, supplemental jurisdiction cannot be exercised over Plaintiff's state law claims against the state Defendants. Based on the above, all of Plaintiff's claims against the individual Defendants in their official capacities will be dismissed on the basis of sovereign immunity, except to the extent that Plaintiff's federal claims may seek prospective injunctive relief.

C

As an alternative to the defense of sovereign immunity, Defendants contend that Plaintiff's § 1983 claims seeking monetary relief against CMU and Coach Guevara, AD Heeke, and Pickler in their official capacities should be dismissed because CMU and its officials are not "persons" within the meaning of § 1983. Section 1983 provides: "Every person who, under color of [state law] subjects, [a] person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." In *Will v. Mich. Dep't of State Police*, the Court held that "a State is not a person within the meaning of § 1983." *See also Hutsell v. Sayre*, 5 F.3d 996, 1002-03 (6th Cir. 1993). Defendants concede that even pursuant to this defense, Plaintiffs may bring claims for injunctive relief against the individual Defendants in their official capacities pursuant to § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State," quoting *Will*, 491 U.S. at 71 n.10.

In response, Plaintiff continues to argue that Defendants in this case have "consented" to suits and waived their immunity through acceptance of federal funds pursuant to § 2000d-7(a)(1). However, whether CMU or the individual Defendants in their official capacities are "persons" within the meaning of § 1983 is a separate issue from whether Defendants have waived their sovereign immunity. Even if sovereign immunity had been waived, CMU and the individual

-16-

Defendants in their official capacities would not be amenable to a suit for monetary damages under § 1983 because they are not "persons" within the meaning of the statute.

Thus, even if Plaintiff's federal and state law claims against the individual Defendants in their official capacities and CMU could not be dismissed on the basis of sovereign immunity, the claims could be dismissed based on the fact that the Defendants are not "persons" within the meaning of § 1983, except to the extent that Plaintiff's federal claims seek prospective injunctive relief.

D

Defendants contend that Plaintiff's breach of contract claim against CMU should be dismissed based on the statute of frauds, as an alternative to dismissal based on Eleventh Amendment immunity. In their motion to dismiss, Defendants asserted that Plaintiff's breach of contract claim was only brought against CMU. In her response, Plaintiff did not dispute this contention; thus, the Court will construe the claim as only brought against CMU. Having determined that CMU is entitled to sovereign immunity, above, Defendant's statute of frauds defense need not be reached. The claim will be dismissed on the basis of sovereign immunity.

E

Defendants contend that Plaintiff's state law tort claims for defamation (count 4), tortious interference (count 5), intentional infliction of emotional distress (count 6), negligent hiring (count 8), and negligent supervision (count 9) against CMU; and Plaintiff's claims for negligent hiring (count 8) and negligent supervision (count 9) against AD Heeke should be dismissed because CMU and AD Heeke are entitled to governmental immunity. As discussed above, CMU is entitled to sovereign immunity, and these claims will be dismissed on that basis. However, Plaintiff's claims

regarding the negligent hiring and negligent supervision of Defendant Guevara by AD Heeke are entitled to separate attention and analysis.

Whether a government officer can be held liable for state law tort claims is governed by state law. Under Michigan law, a government officer is immune from tort liability when three requirements are met: (1) the officer "is acting or reasonably believes he or she is acting within the scope of his or her authority," (2) "[t]he governmental agency is engaged in the exercise or discharge of a governmental function," and (3) the officer's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2). "Gross negligence" means "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* § 691.1407(7). To be "grossly negligent, conduct must be "substantially more than negligent." *Maiden v. Rozwood*, 597 N.W.2d 817, 824 (Mich. 1999). In order to be "the proximate cause" of an injury, "a defendant's conduct must be 'the one most immediate, efficient, and direct cause preceding an injury,' " and not merely "a proximate cause." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 552 (6th Cir. 2009) (quoting *Robinson v. City of Detroit*, 613 N.W.2d 307, 311 (Mich. 2000)).

A "plaintiff must plead her case in avoidance of immunity," because "governmental immunity is a characteristic of government." *Mack v. City of Detroit*, 649 N.W.2d 47, 54 (Mich. 2002) (rejecting the characterization of governmental immunity as an affirmative defense). "A plaintiff pleads in avoidance of governmental immunity by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a nongovernmental or proprietary function." *Id.* at 57.

Defendants contend that the first two statutory requirements are met, that AD Heeke

-18-

reasonably believed that he was acting within the scope of his authority and that he was engaged in the discharge of a governmental function, because any of AD Heeke's conduct related to the hiring or supervision of Coach Guevara would have occurred within his role as the Athletic Director. Defendants also contend that the third requirement, that AD Heeke's conduct "does not amount to gross negligence," is met because Plaintiff has not even alleged that AD Heeke's conduct amounted to gross negligence.

In response, Plaintiff contends that she has sufficiently plead AD Heeke's conduct that amounts to gross negligence in paragraphs 201 through 216 of the complaint. In her complaint, Plaintiff alleges that AD Heeke owed Plaintiff "a duty to use reasonable care in hiring and retaining only those employees who would not cause her to suffer injury." Compl. ¶ 202. Specifically, with respect to her claim of negligent hiring, Plaintiff alleges that AD Heeke should have:

> . . . investigated [Coach] Guevara's background, including, but not limited to, the fact that there was a history of poor interpersonal relationships among [Coach] Guevara and the players on the women's basketball team at the University of Michigan during the time [Coach] Guevara was head coach of that program; and the fact that six players left the women's basketball team at the University of Michigan during the seven seasons that [Coach] Guevara was head coach of that program, each departing player citing poor communication on the part of [Coach] Guevara or [Coach] Guevara's invasions into her personal life (such as being upset because she wore make-up or tight clothing or otherwise acted in a feminine way) as the reasons for her leaving the team; and the fact that [Coach] Guevara and the University of Michigan had been sued by an assistant coach because of [Coach] Guevara's behavior and actions.

Compl. ¶ 203.

With respect to her claim of negligent supervision, Plaintiff alleges that AD Heeke "failed to investigate, or failed to adequately investigate, or w[as] negligent in investigating, [P]laintiff's complaints that [Coach] Guevara discriminated against her and unlawfully harassed her because of her race and color and sexual preference and deprived her of her federally-protected constitutional

rights." Compl. ¶ 213. Plaintiff further alleges that AD Heeke "had actual knowledge, or should have known, that [Coach] Guevara was discriminating against [P]laintiff and unlawfully harassing [P]laintiff on the basis of her race and color and sexual preference, and depriving [P]laintiff of her federally-protected constitutional rights." Compl. ¶ 215. While Plaintiff concedes that she did not use the words, "gross negligence," in her complaint, Plaintiff requests leave to amend the complaint to include those words, if the Court finds that the complaint is not sufficiently clear.

Based on the facts alleged by Plaintiff in her complaint, it is not clear that allowing Plaintiff to amend the complaint to include the words, "gross negligence," would not be futile. *See Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995) ("A motion to amend a complaint should be denied if the amendment . . . would be futile."); *Rose v. Hartford Underwriters Ins. Co*., 203 F.3d 417, 420 (6th Cir. 2000) ("A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss."). While Michigan law subjects "an employer . . . to liability for their negligence in hiring, training and supervising their employees," *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220, 227 (Mich. 2006), Plaintiff does not explain how AD Heeke's conduct was negligent, let alone grossly negligent.

Specifically, Plaintiff alleges that AD Heeke should have further investigated Coach Guevara's background, particularly Coach Guevara's history of "poor interpersonal relationships," but she has not provided any legal support for the proposition that such conduct amounts to "gross negligence" in hiring. Similarly, Plaintiff alleges that AD Heeke knew or should have known of Coach Guevara's conduct towards Plaintiff, but she has not provided any legal support for the proposition that such conduct amounts to "grossly negligent" supervision. Nonetheless, the Court will provide Plaintiff an opportunity to provide an explanation and legal support for the proposition

-20-

that AD Heeke's alleged conduct amounts to grossly negligent hiring and supervision in a supplemental brief.  Plaintiff should also identify any additional facts that she would allege in an amended complaint if the Court were to grant her leave to file an amended complaint.  Defendants will be directed to file a responsive supplemental brief.

F

Lastly, Defendants contend that Plaintiff's defamation claim should be dismissed against all Defendants because Plaintiff has failed to plead the claim with sufficient specificity pursuant to Michigan law and Federal Rule of Civil Procedure 9(g).  Under Michigan law, a plaintiff must "plead a defamation claim with specificity." *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 394 (Mich. Ct. App. 1992).  A plaintiff cannot rely on general, conclusory allegations to support a defamation claim, but must specifically identify the statements alleged to be defamatory. *Id.* at 394-95.

Generally, a plaintiff must prove four elements of a defamation claim:

> 1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm [defamation per se] or the existence of special harm caused by publication [defamation per quod].

*Nichols v. Moore*, 477 F.3d 396, 398 (6th Cir. 2007) (quoting *Rouch v. Enquirer & News*, 487 N.W.2d 205, 211 (Mich. 1992)); Restatement (Second) of Torts § 558 (1977).  Based on these elements, when a plaintiff alleges defamation per se, a plaintiff need not allege any special harm because such harm is presumed to have occurred.  *See generally* 2 Mich. Law & Practice, Torts, § 3.68 (2d ed. 2004) (explaining that "Michigan courts traditionally characterized statements that held plaintiffs up to hatred, scorn, contempt, or ridicule, or that were made with a malicious intent, as

-21-

constituting defamation per se").  In contrast, when a plaintiff alleges defamation per quod, the plaintiff must specifically allege the special damages that are an element of the claim.  *See* Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated.").

Defendants contend that Plaintiff has not alleged defamation per se, because under Michigan law, defamation per se is limited to words imputing a lack of chastity or the commission of a crime, citing Mich. Comp. Laws § 600.2911, and *Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 381-82 (Mich. Ct. App. 2000) (explaining that § 600.2911(1) "is the codification of the common-law principle that words imputing a lack of chastity or the commission of a crime constitute defamation per se and are actionable even in the absence of an ability to prove actual or special damages").[3] Thus, Defendants contend that Plaintiff must specifically allege special damages and further contend that she has not done so because she has not alleged that she suffered any direct financial loss resulting from her allegedly impaired reputation.  Defendants also contend that Plaintiff has not plead her defamation claim with sufficient specificity because she has not alleged any facts setting forth the alleged defamatory statements or stating when and to whom the alleged defamatory statements were made.

---

[3]  Michigan's defamation statute, § 600.2911, provides in pertinent part:

(1)  Words imputing a lack of chastity to any female or male are actionable in themselves and subject the person who uttered or published them to a civil action for the slander in the same manner as the uttering or publishing of words imputing the commission of a criminal offense.

(2)(a)  Except as provided in subdivision (b), in actions based on libel or slander the plaintiff is entitled to recover only for the actual damages which he or she has suffered in respect to his or her property, business, trade, profession, occupation, or feelings.

. . .

(7)  An action for libel or slander shall not be brought based upon a communication involving a private individual unless the defamatory falsehood concerns the private individual and was published negligently. Recovery under this provision shall be limited to economic damages including attorney fees. . . .

In her response, Plaintiff contends that she has alleged defamation per se because she has alleged that statements made by Defendants injured her reputation. To support this proposition, Plaintiff relies on *Yono v. Carlson*, - - - N.W.2d - - - -, 283 Mich. App. 567, 2009 WL 1150403, at *2 (Apr. 28, 2009) (per curiam), in which the court quoted the definition of defamation per se from Black's Law Dictionary 417 (6th ed. 1990), as follows:

> Words are defamatory per se if they, "by themselves, and as such, without reference to extrinsic proof, injure the reputation of the person to whom they are applied."

The court further stated, "Whether nominal or substantial, where there is defamation per se, the presumption of general damages is well settled." *Id.* (quoting *Burden*, 613 N.W.2d at 382). Based on those statements, Plaintiff appears to argue that because she has alleged injury to her reputation, she has alleged defamation per se.

However, it would entirely undermine the distinction between defamation per se and defamation per quod if it was accepted that alleging a reputational injury is sufficient to allege defamation per se. Michigan courts generally define defamatory communication through reference to the Restatement (Second) of Torts § 559, which provides:

> A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

*See, e.g.*, *Rouch*, 487 N.W.2d at 210-11. Thus, under Plaintiff's interpretation of *Yono*, the definition of defamation per se would encompass all defamation. Such an interpretation of the case law is not tenable.[4] Moreover, Black's definition simply defines what it means when statements are

---

[4] Notably, the question before the appellate court in *Yono* was not whether particular statements were defamatory per se. Rather the question was, given statements that were defamatory per se, where did the plaintiff's original injury occur for the purpose of determining the proper venue. *Yono*, 2009 WL 1150403, at * 1-2. Based on the fact that damages are presumed in cases where statements are defamatory per se, the court determined that the original injury occurred where the statements were originally published. *Id.* at *2.

-23-

classified as defamation per se. It means that extrinsic proof of injury to reputation is not necessary because such harm is presumed. However, what types of statements are classified as defamation per se, resulting in the presumption of harm, remains a state-law issue not resolved by Black's definition.

Even if the categories of defamation per se under Michigan law are not limited to only statements regarding unchastity and crimes as Defendants contend,[5] Plaintiff has not identified a category of defamation per se that encompasses the statements that she alleges that Defendants made. Thus, there is no justification for concluding that Plaintiff has alleged defamation per se, and her claims will be treated as alleging defamation per quod. As previously stated, a defamation per quod claim requires Plaintiff to plead special damages. However, Plaintiff has not alleged any specific pecuniary harm resulting from the defamation, nor has she explained how any reputational damage translated into economic harm. Thus, Plaintiff has not sufficiently plead her defamation claim and it could be dismissed on that ground.

Additionally, Plaintiff has not identified any specific statements in her complaint other than statements made by Coach Guevara. Thus, Plaintiff has not plead her defamation cause of action with sufficient specificity against either AD Heeke or Picker. To the extent that Plaintiff has brought her defamation cause of action against AD Heeke or Pickler, those claims could be dismissed based on the lack of specificity. However, before dismissing Plaintiff's defamation claim on the grounds

---

[5] *See generally Nehls v. Hillsdale College*, 65 F.App'x 984, 991 (6th Cir. 2003) (acknowledging that "at common law, defamation per se typically concerns issues of chastity, commission of a crime, loathsome disease, or disparagement of one's profession or business"). It has been suggested that in Michigan, "the common-law list of actions that constituted defamation per se has been replaced by the significantly more narrow statutory provisions." 2 Mich. Law & Practice, Torts, § 3.68 (2d ed. 2004). However, Defendants have not advanced any legal authority to directly support the proposition that § 600.2911 supersedes the common law.

that Plaintiff has not sufficiently plead the claim against AD Heeke or Pickler, or because Plaintiff has not plead special damages as to any Defendant, permitting Plaintiff an opportunity to amend the complaint may be appropriate.

Yet, the issue of allowing Plaintiff to file an amended complaint alleging any potential special damages or statements made by AD Heeke or Pickler is complicated by the fact that Defendants raise two additional arguments in their reply brief, which suggest that amendment of the complaint would be futile.  Defendants contend that their alleged statements are not actionable because they are subject to an absolute privilege and are matters of opinion.  In the event that either of these arguments have merit, allowing Plaintiff to amend the complaint to plead special damages or specific statements by AD Heeke or Pickler would be futile, as other grounds would exist to dismiss the defamation claim.  Thus, before dismissing the defamation claim, or granting Plaintiff leave to file an amended complaint, the parties will be directed to submit supplemental briefing on these issues.  Plaintiff will be directed to submit a supplemental brief identifying the special damages and specific statements of AD Heeke and Pickler that she would allege in an amended complaint and responding to Defendants' arguments regarding absolute privilege and opinion. Defendants will be directed to file a supplemental brief responsive to Plaintiff's supplemental brief.

IV

Accordingly, it is **ORDERED** that Defendants' motion to dismiss [Dkt. # 24] is **GRANTED IN PART**.

It is further **ORDERED** that the parties are **DIRECTED** to file supplemental briefing consistent with this order.  Plaintiff shall submit a supplemental brief on or before **September 14, 2009**.  Defendants shall submit a supplemental brief on or before **September 28, 2009**.

It is further **ORDERED** that the hearing scheduled for September 9, 2009, is **CANCELED**.

It is further **ORDERED** that all of Plaintiff's claims against Defendant Central Michigan University Board of Trustees are **DISMISSED** on the basis of sovereign immunity.

It is further **ORDERED** that all of Plaintiff's claims against Defendants Sue Guevara, Dave Heeke, and Patricia Pickler in their official capacities are **DISMISSED** on the basis of sovereign immunity, except Plaintiff's federal claims (counts 1 and 2) to the extent that they seek prospective injunctive relief.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 2, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 2, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS